REPUBLIC UNDERWRITERS et al. v.
MEYER et al.

No. 13826.

Court of Civil Appeals of Texas.
Fort Worth.

March 31, 1939.

Rehearing Denied April 28, 1939.

Arthur P. Bagby and Smith, Goldsmith & Bagby, all of Austin, for appellant Republic Underwriters.

Darden, Burleson & Wilson, of Waco, for appellant A. B. Shoemake.

Donald & Donald, of Bowie, for appellee.

DUNKLIN, Chief Justice.

This suit was instituted by Miss Susette Meyer, and Mrs. Clara Donald, joined by her husband, Paul Donald, on a fire insurance policy, issued by "Republic Underwriters, A. B. Shoemake, Attorney", by the terms of which the Republic Underwriters insured "Trustees Pentacostal Church" against loss or damage by fire to a church building situated on Lot 6 and part of Lot 7, in Block 7, of the town of Bowie, Texas, and further described as being at No. 411 Toombs Avenue. The policy stipulated for payment of $1,250 in event of destruction of the house, designated as a church, by fire, in accordance with its provisions, and further that it was issued as a Standard Fire Insurance policy.

The policy embodied these provisions:

"This policy is made by Republic Underwriters, having special regulations lawfully applicable to its organization, policies and contracts of insurance, and such regulations shall apply to and form a part of this policy the same as if actually written or printed upon, attached or appended thereto.

"Special Provisions.

"The Underwriters are organized and operating under the provisions of the Insurance Laws of Texas applicable thereto. Subscribers hereat are individuals, partnerships, and corporations, which have each executed an agreement, hereby made a part hereof, which vests in A. B. Shoemake, herein called 'Attorney' power to make this policy contract for them.

"If at the time of any loss under this Policy, any other insurance shall be in force which shall cover specifically in two or more divisions and amounts upon any property covered in any one division and amount by this Policy, then this Policy shall be assumed to be written in like form to the Policy containing the greater number of divisions.

"But in case of non-concurrence in specific items only, all other policies of insurance shall be considered as concurring fully with this Policy, and the Carrier shall pay only its equitable share on that basis. If any policy in any other company covering the described property, or any part thereof, shall contain any condition of average, or co-insurance, this Policy shall be subject to the conditions of average or co-insurance in like manner."

When the policy was issued, the estate of Mrs. Susette Meyer, deceased, was the owner and holder of certain promissory notes, executed by the "Pentacostal Church of God", secured by mortgage lien on the lot described above, executed by the deacons of the "Pentacostal Assembly of God Church of Bowie, Texas", and at the time of trial there was approximately $1,500.00 due and unpaid on the notes secured. Attached to the policy at the time it was issued was a rider reading:

"Loss Payable Clause.

"It is agreed that any loss or damage ascertained and proven to be due to the assured under this policy shall be held payable to the Mrs. Susette Meyer Estate as interest may appear; subject, however, to all the terms and conditions of this policy, which are made a part hereof."

According to allegations in plaintiffs' petition, which were sustained by uncontroverted testimony introduced on the trial, Mrs. Susette Meyer was dead; she died intestate, owing no debts; no administration was had on her estate; plaintiffs, Miss Susette Meyer and Mrs. Clara Donald, wife of Paul Donald, are her only heirs. She died in the year 1933; the policy was issued March 14th, 1935; the loss payable clause was made in favor of "Mrs. Susette Meyer Estate", as a convenient designation of plaintiffs as her heirs and beneficiaries under that clause.

A judgment was rendered in favor of plaintiffs against Republic Underwriters, Waco, Texas, and A. B. Shoemake, Waco, Texas, its attorney in fact, jointly and severally, for the sum of $1,398.95, the same being for $1,250, the amount stipulated in the loss payable clause of the policy, with interest accruing thereon at the rate of six per cent per annum, from December 1st, 1935, to date of the judgment.

The defendants have appealed.

Following numerous exceptions to the petition and a plea of general denial, defendants pleaded as a special defense that the building had become vacant and unoccupied for more than ten days before the fire, and therefore under a special provision of the policy the same had lapsed and was of no further force or effect.

Another special defense pleaded was the alleged failure of plaintiffs to furnish proof of loss within 90 days after such loss, as required by the policy, as a condition of liability, and for that further reason, no recovery could be had.

There was a further plea of tender to plaintiffs of the amount of premiums that defendant had collected on the policy, which was alleged to be the full amount for which the defendants could be held in any event.

By supplemental petition, plaintiffs alleged failure and refusal of defendants to furnish to them blank printed forms of proof of loss, upon their application therefor, and an alleged consequent waiver by defendants of right to defeat payment for lack of such proof.

Findings of the jury on all of the several special issues submitted were favorable to plaintiffs and furnished a sufficient basis for the judgment rendered, if given effect.

Plaintiffs' amended petition, on which they went to trial, included these allegations:

"That on or prior to March 14th, 1933, certain individuals, partnerships and/or associations of individuals, whose names are unknown to your plaintiffs, but well known to the defendants, executed a power or powers of attorney to the defendant, A. B. Shoemake, authorizing the said A. B. Shoe-

make, as such attorney, to execute contracts of insurance against loss by fire, conformable to the insurance laws of the State of Texas; that thereafter, said A. B. Shoemake, defendant herein, applied to the Board of Insurance Commissioners for the State of Texas for license to so execute and deliver policies of insurance against loss by fire, and that thereafter such license was duly issued to said A. B. Shoemake, as attorney for such subscribers, authorizing him for and in behalf of such subscribers, to issue policies of insurance against loss by fire, conformable to the insurance laws of the State of Texas, in the name of the defendant, 'Republic Underwriters' by A. B. Shoemake, Attorney.

"Plaintiff further alleges that said 'Republic Underwriters', with A. B. Shoemake as their duly authorized attorney, were organized and duly licensed, as aforesaid, under the provisions of Chapter Nineteen (19), Title 78, of the Revised Statutes of 1925; and in the alternative alleged, that if mistaken in that, that it was organized with A. B. Shoemake as attorney duly authorized, and duly licensed as aforesaid under the provisions of Chapter Twenty (20), Title 78, of the Revised Statutes of 1925."

Then follow allegations of the facts on which claim of liability was based, including allegation that the church was owned by the Pentacostal Church of Bowie at the time of the fire; the total loss of the building by fire on September 29th, 1935; also an endorsement on the policy reciting that it covered loss or damage by fire of a building situated on the lot above noted "while occupied as a place of public worship, and known as Trustees Pentacostal Church." With prayer for judgment against Republic Underwriters and A. B. Shoemake, jointly and severally.

In answer to plaintiff's original petition, the defendants filed a plea in abatement, verified by oath, by the defendant A. B. Shoemake himself, and also by Frank M. Wilson, attorney representing both defendants, from which we quote the following: "That the defendant, Republic Underwriters, herein is sued as an unincorporated joint stock association, and according to the allegations in the prayer of plaintiffs' original petition herein under the provisions of Chapter 19, Title 78 of the Revised Statutes of Texas, 1925, and as operating upon the so called Lloyds plan; that this defendant is not an unincorporated joint stock association, nor any such party

as is described in plaintiff's petition; and is not authorized to do business or to sue or be sued as alleged in plaintiff's petition, but that this defendant is an inter-insurance or reciprocal exchange, organized under and doing business by virtue of the laws of the State of Texas, towit, Chapter 20, Title 78 of the Insurance Laws of the State of Texas, R.C.S.,1925, and that this cause should be abated by reason of the aforesaid facts."

Those allegations were adopted in answer to plaintiff's first amended original petition upon which the case went to trial, and also likewise duly verified by counsel for the defendants.

No proof was offered by either plaintiffs or defendants that the Board of Insurance Commissioners had ever issued to the Republic Underwriters a permit to execute fire insurance policies, as provided by Chapter 19, Title 78, Rev.Civ.St., beginning with Art. 5013, Vernon's Ann.Civ.St. art. 5013 et seq., or that any application had been made for such a permit.

Plaintiffs introduced in evidence a certificate of authority issued by the Board of Insurance Commissioners to Republic Underwriters, to exchange reciprocal or inter-insurance contracts of the character therein specified, with other underwriters, under provisions of Chapter 20 of Title 78. Vernon's Ann.Civ.St. art. 5024 et seq. That permit was dated February 21st, 1936, covering the period ending February 28th, 1937, while the policy sued on herein was issued nearly two years prior thereto, towit, on March 14th, 1935, covering a period of one year from that date, and, as found by the jury, the fire occurred on or about September 29th, 1935, some five months prior to the issuance of the permit. For that reaon, it was not admissible in evidence. Indeed, defendants objected to its admission because immaterial for that reason.

Defendants having expressly alleged in their answer to the merits of plaintiffs' suit that the Republic Underwriters was organized and doing business under the provisions of Chapter 20, Title 78, of Vernon's Texas Civil Statutes, and that the policy was issued under that statutory authority, it was not necessary for plaintiff to make proof of that fact. Because this statement, in 33 Tex.Jur., sect. 191, p. 647, is abundantly supported by numerous decisions cited in the foot-notes: "Since the office of pleadings is to define the issues to

be tried, and since pleadings are matter of record as distinguished from matter of evidence, an adversary's pleadings are not required to be introduced in evidence in order to obtain the benefit of any admissions therein. For the same reasons, what is alleged in the pleadings on which the trial is had is conclusive against the pleader. No controverting evidence may be introduced, for no issue as to that fact is presented. However, if an admission was made by mistake, the pleader is not remediless; he should apply for leave to file an amended pleading."

Among the authorities so cited are the following: Caulk v. Anderson, 120 Tex. 253, 37 S.W.2d 1008; Lafield v. Maryland Casualty Co., 119 Tex. 466, 33 S.W.2d 187; Ogden v. Bosse, 86 Tex. 336, 344, 24 S.W. 798; and many other former decisions of the Supreme Court, referred to in those cases.

Following are some of the articles in Chapter 20, Title 78, under which it was alleged the Republic Underwriters was organized and doing business, which show the character of insurance thereby authorized.

Article 5024 (which is the first Article in the Chapter): "Individuals, partnerships and corporations of this State hereby designated subscribers are hereby authorized to exchange reciprocal or inter-insurance contracts with each other, or with individuals, partnerships and corporations of other States and countries, providing indemnity among themselves from any loss which may be insured against under other provisions of the laws, excepting life insurance."

Article 5025: "Such contracts may be executed by a duly appointed attorney in fact duly authorized and acting for such subscribers. The office or offices of such attorney may be maintained at such place or places as may be designated by the subscribers in the power of attorney."

Article 5026: "Such subscribers, so contracting among themselves, shall, through their attorney, file with the Commissioner a declaration verified by the oath of such attorney setting forth:

"1. The name or the title of the office at which subscribers propose to exchange such indemnity contracts. Said name or title shall not be so similar to any other name or title previously adopted by a similar organization, or by any insurance corporation or association, as in the opinion of such Commissioner is calculated to confuse or deceive. The office or offices through which such indemnity contracts shall be exchanged shall be classified as reciprocal or inter-insurance exchanges.

"2. The kind or kinds of insurance to be effected or exchanged.

"3. A copy of the form of policy, contract or agreement under or by which such insurance is to be effected or exchanged.

"4. A copy of the form of power of attorney or authority of such attorney under which such insurance is to be effected or exchanged.

"5. The location of the office or offices from which such contracts or agreements are to be issued.

"6. That applications have been made for indemnity upon at least seventy-five separate risks, aggregating not less than one-half million dollars as represented by executed contracts or bona fide applications to become concurrently effective, or in case of liability or compensation insurance, covering a total payroll of not less than two thousand employes.

"7. That there is on deposit with some State or National bank as a depository for the payment of losses not less than the sum of ten thousand dollars."

Article 5029: "There shall at all times be maintained as a reserve a sum in cash or convertible securities equal to one-half of the aggregate net annual deposits collected and credited to the accounts of the subscribers on policies having one year or less to run and pro-rata on those for longer periods. For the purpose of said reserve, net annual deposits shall mean the advance payments of subscribers after deducting therefrom the amounts specifically provided in the subscribers' agreements for expenses and reinsurance. Said sum shall at no time be less than ten thousand dollars, and if at any time one-half of the aggregate deposits so collected and credited shall not equal that amount, then the subscribers, or their attorney for them, shall make up any deficiency."

Article 5031: "Any corporation now or hereafter organized under the laws of this State shall, in addition to the rights, powers and franchises specified in its articles of incorporation, have full power and authority to exchange insurance contracts of the kind and character herein mentioned. The right to exchange such contracts is hereby declared to be incidental to the pur-

poses for which such corporations are organized and as much granted as the rights and powers expressly conferred."

Article 5033: "Except as herein provided, no insurance law of this State shall apply to the exchange of such indemnity contracts unless they are specifically mentioned."

■ The policy sued on shows on its face that it was not such a policy as could have been lawfully issued, under the provisions of Chapter 20, Title 78. It is in no sense a contract between subscribers "to exchange reciprocal or inter-insurance contracts with each other, or with individuals, partnerships and corporations of other States and countries, providing indemnity among themselves from any loss which may be insured against under other provisions of the laws, excepting life insurance." The only parties to the contract are the insurer and the "Trustees Pentacostal Church", with the loss payable clause in favor of the "Mrs. Susette Meyer Estate, as interest may appear."

It is a regular, standard fire insurance policy, and does not purport to be issued under provisions of Chapter 20, Title 78.

24 Tex.Jur., sect. 416, p. 1296, reads:

"The Revised Statutes contain general provisions relating to the incorporation and organization of insurance companies, and specific provisions relating to life, health and accident corporations, fire and marine companies, surety and trust companies, and employers' liability insurance companies. The general statute provides:

"'Any number of persons desiring to form a company for the purpose of transacting insurance business shall adopt and sign articles of incorporation, and submit the same to the Commissioner who in turn shall submit the same to the Attorney General. If said articles shall be found by the Attorney General to be in accordance with the law of this State, and of the United States, he shall attach thereto his certificate to that effect, whereupon such articles shall be deposited with the Commissioner of Insurance.'

"This is a general law applicable to all insurance corporations except such as may be excluded by other provisions of the statute."

These statutes so referred to are the only authority conferred by the Statutes for the issuance of any character of insurance.

The record therefore indubitably discloses the issuance of a fire insurance policy, which it had no authority to issue, under any of the provisions of Chapter 20, Title 78, of the Revised Statutes. The defendants allege such statutes were the statutes under which the Republic Underwriters was organized.

■ It follows, therefore that the defendant, Republic Underwriters, is bound by its contract of insurance, evidenced by the policy, under the principles of common law; it cannot invoke the statutory provisions in Chapter 20, under which it was organized, to escape such liability; so to do would be to permit it to take advantage of its own wrong in inducing the acceptance of the policy under the pretense of statutory authority to issue it.

Article 5056, Vernon's Texas Civil Statutes, reads in part, as follows: "Any person who solicits insurance on behalf of any insurance company, whether incorporated under the laws of this or any other State or foreign government, or who takes or transmits other than for himself any application for insurance or any policy of insurance to or from such company, or who advertises or otherwise gives notice that he will receive or transmit the same, or who shall receive or deliver a policy of insurance of any such company, or who shall examine or inspect any risk, or receive, or collect, or transmit any premium of insurance, or make or forward any diagram of any building or buildings, or do or perform any other act or thing in the making or consummating of any contract of insurance for or with any such insurance company other than for himself, or who shall examine into, or adjust or aid in adjusting any loss for or on behalf of any such insurance company, whether any of such acts shall be done at the instance or request, or by the employment of such insurance company, or of, or by any broker or other person, shall be held to be the agent of the company for which the act is done, or the risk is taken, as far as relates to all the liabilities, duties, requirements and penalties set forth in this chapter. * * Any person who shall do any of the acts mentioned in this article for or on behalf of any insurance company without such company having first complied with the requirements of the laws of this State, shall be personally liable to the holder of any policy of insurance in respect of which

such act was done for any loss covered by the same.".

. The substance of that article is carried forward in the Penal Code, in Art. 568 of the Penal Code, and Art. 570 reads: "Whoever shall do or perform any of the acts or things mentioned in the first article of this chapter [Art. 568] for any insurance company referred to in said article without such company having first complied with the requirements of the laws of this State, shall be fined not less than five hundred nor more than one thousand dollars."

And in 24 Tex.Jur., sect. 99, p. 801, this is said: "As the business of insurance is affected with the public interest, insurance agents and brokers are subject to the regulatory police powers of the State."

■ Aside from that statutory provision, under principles of the common law, Shoemake was personally liable for his participation in the wrongful act of the corporation. 11 Tex.Jur., sect. 368, p. 15, and decisions cited.

The issuance of the policy in suit being unauthorized by the provisions of Chapter 20, Title 78, which is the only authority claimed therefor, the defendant, A. B. Shoemake, is jointly and severally liable to the plaintiffs under that policy, by virtue of the express provisions of said Art. 5056, and other authorities cited above, for any losses recoverable under the policy. He is in no position to invoke the contention stressed in his briefs that since the policy shows on its face that he executed it only as attorney in fact for the Republic Underwriters, he is not personally liable; because to so hold would be to allow him to take advantage of his own wrong.

■ And since the Republic Underwriters and A. B. Shoemake acted together in the issuance of a policy not authorized by the Statute, the court did not err in overruling the plea in abatement presenting alleged misjoinder of parties defendant.

■ Nor is the absence of any proof that the Republic Underwriters was a partnership, as alleged, any obstacle to plaintiffs' right of a recovery; it appearing that it was at all events an association of individuals, acting as a legal entity and doing an insurance business.

■ It is insisted that there was a material variance between allegations in plaintiffs' petition and proof offered, which was fatal to a recovery, and therefore the court erred in overruling defendants' motion for an instructed verdict in their favor, and also their motion for a judgment in their favor non obstante veredicto, after return of the verdict. The variance urged is the alleged difference between allegations in plaintiffs' petition that the policy was issued to "Trustees Pentacostal Church", and at the time of the loss the property was owned by the "Pentacostal Church of Bowie, Texas", while the proof offered by plaintiffs on the trial was that at the time of the fire the property was owned by "The Pentacostal Assembly of God Church of Bowie, Texas." The testimony introduced shows that the church was commonly referred to as the "Pentacostal Church", rather than by its longer and more definite name. Title to the lot and building unquestionably was in the "Pentacostal Assembly of God Church of Bowie, Texas," and the notes under which plaintiffs claim the benefits of the loss payable clause in the policy were executed in that name, through its Board of Deacons. No testimony was introduced to show claim of ownership by any other church, nor did defendants claim surprise by the proof offered by plaintiffs on that issue and move for a continuance, in order to procure evidence of some different ownership. The alleged variance, therefore, involves only a question of identity of the alleged owner of the property insured and of that destroyed by fire, which was fully established; and the assignment now under discussion is overruled. Prichard v. McCord-Collins Co., 30 Tex.Civ.App. 582, 71 S.W. 303; Taylor v. Merrill, 64 Tex. 494; Michon v. Ayalla, 84 Tex. 685, 19 S.W. 878; Thompson v. Dunn & Woodbury, 44 Tex. 88; Cleveland v. Sims, 69 Tex. 153, 6 S.W. 634; Halfin v. Winkleman, 83 Tex. 165, 18 S.W. 433; Huff v. Webb, 64 Tex. 284; Halbert v. Carroll, Tex.Civ.App., 25 S.W. 1102; Cullers v. May, 81 Tex. 110, 16 S.W. 813.

Special Issues Nos. 1 and 2, with findings of the jury thereon, are as follows:

"Special Issue No. 1. Do you find, from a preponderance of the evidence, that fire destroyed the building located upon the land and premises described in the plaintiffs' petition, or any part thereof, on or about September 29, 1935? Answer 'Yes' or 'No', as you find the facts to be.

"Answer: Yes.

"Special Issue No. 2. Do you find from a preponderance of the evidence that aft-

er the fire, if any, on or about September 29, 1935, that there was some substantial portion of the structure remaining which a reasonably prudent owner, uninsured, would have used as a basis for restoring the building to the condition in which it was before the fire? Answer 'Yes' or 'No', as you find the facts to be.

"Answer: No."

■ Defendants objected to Issue No. 2, on the ground that it erroneously imposed upon them the burden of proving that the property insured was not a total loss. The assignment presenting that error is meritorious, but we believe the error was harmless and not a sufficient basis for a reversal of the judgment, because the record shows conclusive and undisputed proof of total loss.

Plaintiff, Mrs. Donald, testified as follows:

"Q. Did you go out there, after you heard the building had burned, to see what happened? A. Yes.

"Q. Was any part of that building left standing? A. Not a thing.

"Q. Did you examine the foundation? A. Yes.

"Q. Had the fire affected the foundation any? A. Yes.

"Q. Tell the jury whether you saw any cracks in it or not. A. I did. I examined the foundation, and there were about a dozen cracks clear to the ground on each side of the building.

"Q. Did you make an examination to see whether the fire had affected the cement? A. Yes, you could take your hand and break off pieces of cement. I suppose it was the fire, I don't know.

"Q. Has that foundation been used since the fire? A. No.

"Q. Have you had any experience in observing foundations of buildings? A. I have observed a good many foundations.

"Q. Tell the jury the condition of that when you saw it, after that fire, and the condition of it now; what it was constructed of. A. The foundation is concrete.

"Q. Was that house on that foundation? A. Yes.

"Q. Did the fire burn the house down to the foundation? A. Yes.

"Q. Tell the jury the condition of that concrete when you went out there after the fire. A. The concrete is cracked all the way around; some places you can put your hand in the cracks, and some of the cracks are small; they are all the way to the ground.

"Q. Is that foundation in the same condition now as it was before the fire? A. I didn't examine it before the fire.

"Q. Did it show any evidence of being cracked before the fire? A. It did not.

"Q. Had you ever seen the foundation before the fire? A. Yes.

"Q. Had you ever seen any cracks in it before the fire? A. I had not noticed any cracks.

"Q. Was the foundation discolored by the fire? A. Yes, it was blackened, smoked.

"Q. What kind of building was that, was it made out of wood? A. Yes, the church was a frame building.

"Q. What kind of a roof did it have on it? A. Shingle roof."

On cross examination by defendants, she further testified:

"Q. You went out there the morning immediately following the fire? A. Yes.

"Q. What was the condition of the premises at that time? A. The condition?

"Q. With reference to the lumber around there? A. There was one corner, a great big charred lumber, on one side and there it was all burned; wasn't anything left except just on one side of the building and that was charred and black.

"Q. Which side was that? A. I think it was the north corner.

"Q. Was it the inside or the outside? A. It was badly burned. Do you mean which side of the boards were burned?

"Q. Yes. A. It looked like the inside.

"Q. Is that there now? A. No, sir.

"Q. Do you know what was done with it? A. No, I do not. Some boys phoned and asked me for that for kindling wood and I told them they would have to see the church people or the insurance company, and he came to see me and I told him I wouldn't touch it. He said they lived in the neighborhood and wanted that for wood, but I didn't give them permission to take it.

"Q. You don't know what was done with it? A. No, sir.

"Q. About how much of that wood was left? A. Wasn't any.

"Q. I know it had fallen down, but how much was left unburned? A. Wasn't any unburned; there was some left there that was good for kindling, but that was all.

"Q. There isn't anything left on the premises now? A. No, sir.

"Q. Do you know of anyone who removed any of the remains from those premises? A. No, I don't.

"Q. There is a concrete foundation remaining there? A. Yes.

"Q. You testified this morning it had some cracks in it, with reference to proximity, where were those cracks? A. It is cracked all the way around, about a foot and a half apart; some places large cracks you can put your hand in, and some smaller. I counted them and there are about a dozen to each side of the building and about eight on the front; some of them pretty bad cracks.

"Q. How is that foundation different from the way it was before the fire? A. Well, it looked all right before the fire. I didn't go over and examine the foundation, however.

"Q. You didn't go over there for that purpose? A. No, I went and examined it after the fire.

"Q. I understand, but before the fire; you just noticed it casually; you don't know what its condition was before the fire? A. No, I don't know. I didn't notice those big cracks you could put your hand through; I didn't notice any cracks, until the fire like that. I had repaired the building a lot for those people and I walked around it and saw the foundation.

"Q. When did you repair it? A. It has been about five years ago.

"Q. That would have been about 1932? A. Yes.

"Q. What kind of repairs did you make at that time? A. I repaired the room and the window lights; the back window, up in the attic had been knocked out."

E. M. Stallings, witness for plaintiffs, who had been in the insurance business for a number of years, had formerly lived in Bowie, Texas, where he had written insurance on the Pentacostal Church and had carried same for a number of years. Before issuance of such insurance he had examined the building, and testified:

"Q. Do you remember when the fire destroyed this building? A. I don't remember the date. I heard the building had been destroyed by fire.

"Q. Have you ever been out there on the location? A. Yes.

"Q. Was there anything left after the fire? A. Well, of value, do you mean?

"Q. Was there anything left? A. Remnants of the foundation.

"Q. Did you examine that foundation? A. Yes.

"Q. In your experience as an insurance man, did you have any experience in inspecting what was left after fires? A. Yes.

"Q. Have you had any experience as to what effect fire has on concrete? A. Yes.

"Q. Have you been present when concrete was being made? A. Yes.

"Q. Did you place your hand upon any part of this foundation? A. Yes.

"Q. Tell the jury what effect it had when pressure was applied to it. A. It crumbled.

"Q. Is that foundation in line? A. Some parts of it, yes.

"Q. Are there any parts out of line? A. Yes.

"Q. From your experience as an adjuster of insurance, have you ever seen a building rebuilt on a foundation like that was? A. No, sir.

"Q. When you put weight on it, what did it do? A. It would crumble."

That testimony of Mrs. Clara Donald and E. M. Stallings was not controverted, no witness being offered to disprove it.

Defendants introduced testimony of several witnesses for the purpose of sustaining their plea that the building was not occupied for a period of more than ten days before the fire, and therefore the insurance had lapsed before the fire. That testimony tended to show that the Pentacostal Church had not held services in the building for a few months before the fire, and that the deacons of the church had proposed to deed it and the lot on which it was constructed to plaintiffs. But according to other testimony, during the time the Pentacostal Church did not hold services in the building it had permitted another church denomination so to do on one occasion, and that it had never intended to abandon the building as a place of worship. In view of all such testimony, we believe the issue of non-occupation for church purposes within the meaning of the terms of the policy was a disputed issue of fact, which the court could not withdraw from the jury.

Error has been assigned to the following definition given by the court to the jury, over defendants' objection thereto, when the case was submitted to the jury: "Whenever the term 'occupancy for church purposes' is used in this charge, it means that manner of use which ordinarily prudent persons would make of such building for conducting religious services."

Defendants' objection to the instruction was because "it is vague, confusing and indefinite, in that same is not a proper or correct definition of the term sought to be defined", and for reasons of an equally general nature, not necessary to be noted.

The court overruled the objection with this explanation: "Let the record show that at 3:30 o'clock the defendants asked the court to give a definition of the phrase 'occupancy for church purposes,' and the court in return asked counsel for the defense if they would submit to the court such definition, or definitions, and that it is now 5:25 o'clock P. M., and they have not done so, nor attempted to do so, and during the time the court and attorneys for plaintiffs have tried to prepare and did prepare what they thought was the best definition of the phrase 'occupancy for church purposes,' which is as follows: 'Occupancy for church purposes means that manner of use which ordinarily prudent persons would make of such building for conducting religious services', and in view of defendants' objections to this definition, and in view of the fact that they have not presented a definition to the court, either suitable or otherwise of any kind or character, the court will give the definition as given in the charge."

The very purpose for which a church building is used for public worship necessarily implies that during certain intervals no services will be held therein, under certain contingencies, and for that reason we are unable to condemn the instruction complained of. Appellants cite: Georgia Home Insurance Co. v. Brady, Tex.Civ. App., 41 S.W. 513, and Agricultural Insurance Co. v. Owens, 63 Tex.Civ.App. 354, 132 S.W. 828, which involved the question of vacancy of buildings used for purposes other than public worship. And in the case first cited, this test is laid down of occupancy of a residence that had been insured against loss by fire [41 S.W. 515]: "* * * such an occupancy as the parties must be presumed to have intended,—

that is, a practical occupancy, consistent with the purposes for which the property was insured; and mere temporary absence from the premises by the plaintiff or the members of his family does not operate as a breach of the obligation to occupy such premises, provided you believe from the testimony that such absence was a contingency, which may fairly be said to have been within the contemplation of the parties."

It seems to us that the definition complained of here is in substantial accord with that test.

Moreover, the failure of defendants to point out in what particular the definition was incorrect precludes the attack now urged here, under the opinion of the Commission of Appeals, in Perkins v. Nevill, Tex.Com.App., 58 S.W.2d 50, and other decisions, such as Gray v. Adolph, Tex.Civ.App., 117 S.W.2d 122; Southern Underwriters v. Kelly, Tex.Civ. App., 110 S.W.2d 153.

Nor have appellants complained of the finding of the jury noted on the issue of non-occupancy, as being without sufficient support in the evidence.

All assignments of error are overruled and the judgment of the trial court is in all things affirmed.